Filed 7/23/14  A.S. v. Super. Ct. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| A.S.,<br><br>    Petitioner,<br><br>v.<br><br>SANTA BARBARA COUNTY<br>SUPERIOR COURT,<br><br>    Respondent;<br><br>SANTA BARBARA COUNTY<br>DEPARTMENT OF SOCIAL SERVICES,<br>CHILD WELFARE SERVICES,<br><br>    Real Party in Interest. | 2d Civil No. B255320<br>(Super. Ct. Nos. J1435867, J1435868,<br>J1435869)<br>(Santa Barbara County) |

A.S. (mother) challenges an order of the juvenile court bypassing family reunification services and setting a permanent plan hearing regarding her three minor children.  (Welf. & Inst. Code, §§ 361.5, subds. (b)(6)-(7), 366.26, subd. (c).)[1]  We deny her petition for extraordinary writ.

FACTUAL AND PROCEDURAL HISTORY

Mother and J.L. (father) are the biological parents of three sons, D.S., J.S., and G.S.  The children were 6 years old, 2 years old and 4 months old, respectively, when

_____

[1]All further statutory references are to the Welfare and Institutions Code.

Santa Barbara County Child Welfare Services (CWS) removed them from their parents' custody. In October 2013, CWS received a complaint that father was sexually abusing D.S. A maternal aunt who was babysitting the boys discovered D.S. "humping" her three-year-old daughter. When the aunt spoke with D.S. about it, he became upset and told her his father put his penis in D.S.'s mouth and in his "butt." He said he told his mother about this and that she yelled at father and told father not to do it again. After the aunt told mother what had occurred, she accused D.S. of lying.

D.S. told a social worker, Laurie Lee, that "[m]y dad put his 'peanut' into my mouth and put his 'peanut' in my butt," pointing to his groin area. D.S. said, "He does it every day." "He comes into my room, he takes my clothes off. He takes his clothes off. It is dark and he hurts me. He made me cry." When Lee told mother of D.S.'s statements, which Lee found credible, mother responded, "I'm not sure I believe him or not. I need to talk to him to see if he is lying."

During a recorded interview with a sexual abuse response team (SART), D.S. made the same disclosure of sexual abuse. Once again, mother denied knowing about the abuse. She said, "I haven't heard it come from [D.S.]. I don't know when it could have happened." She dismissed the possibility that father could have sexually abused D.S. while mother was working the evening shift at a convalescent home. Mother said, "I don't think anybody has molested [D.S.]. [Father] hasn't been a good part of his life. They don't get along . . . . [D.S.] doesn't even like him at all. I need more proof than what he's saying. I need more proof to believe him." She insisted that "[j]ust because I don't believe he has been molested doesn't mean I'm not a good mother." Mother brought father to the police station, where he denied the allegations of abuse.

CWS filed a petition against both parents alleging neglect under section 300, subdivision (b) and sexual abuse under subdivision (d). It alleged mother "has failed to protect the child [D.S.] adequately . . . [and] knew or reasonably should have known that the child was in danger of sexual abuse." The juvenile court detained the children and ordered them placed in a relative's care. The parents were offered services and visitation.

2

Mother had two prior referrals of general neglect, which CWS dismissed as unfounded. Eight months before the children's detention, CWS received a complaint that father was sexually abusing his daughter, A.L., the half-sister of D.S., J.S. and G.S. A.L. recalled that when she was eight years old, father got into bed with her. He reached into her pajama pants and put his index finger into her vagina. A.L. said that it hurt a lot and she told him to stop. Father replied, "I don't want to stop." She pushed father off, ran into the bathroom and locked the door. A.L. tried to report the incident to father's girlfriend (mother), and did report it to her own mother, who alerted authorities. Father denied the allegation, and the referral was closed as inconclusive.

In October 2013, D.S. disclosed that he saw father sexually abusing A.L., which A.L. confirmed. A.L. said that father suggested they play a game of "Hide and Go Seek." When she hid in her room, father followed her, opened his pants and put his penis into her mouth while making motions with his body. CWS filed a juvenile dependency petition as to both A.L. and her sister. Father was arrested and incarcerated on charges related to sexual abuse of D.S.

Prior to the jurisdiction hearing, mother had bi-weekly supervised visits with the boys. She was appropriate with them and demonstrated good parenting skills. The children were in good health and appeared developmentally on track. D.S. presented with some autistic qualities and participated in individual therapy sessions to help him cope with the abuse and to reduce his sexually reactive behavior. After one visit with mother, D.S. said he wished he could live with her.

Mother, the maternal aunt, Lee and two law enforcement detectives testified at the contested jurisdiction hearing. The court found the maternal aunt's testimony was credible and that she appeared motivated to help D.S., rather than to hurt mother. Mother testified that she did not think father was capable of sexually abusing D.S. and that she did not believe her son's disclosure of sexual abuse. CWS presented evidence that mother was visiting father in jail and helping him defend the criminal allegations. In a telephone conversation with father, mother said, "I hate to lose my kids, I hate to lose a good guy." Father replied, "If they want to judge us, they can." Mother

3

and father routinely referred to each other as "baby" and "babe," and she ended one conversation by saying, "I love you and we'll get through this one way or another."

The juvenile court sustained the section 300 petition and set a disposition hearing. It found that "mother indicates that her priorities are her children yet does not believe allegations. Her actions are contrary to her statements." The court allowed mother to continue with supervised visits.

At the disposition hearing for A.L. and her sister, the juvenile court bypassed family reunification services for father under section 361.5, subdivision (b)(6). CWS recommended that mother and father be denied reunification services in this case under subdivisions (b)(6) and (b)(7).

The juvenile court held a three-day contested disposition hearing for D.S., J.S. and G.S. Social worker Heather Race testified that, in her opinion, the children would not benefit from reunification services with mother. She observed mother was loving and supportive of father during their recorded jail telephone calls and "there was no discussion really at all about whether or not the father was guilty or innocent or whether [D.S] was telling the truth or not." She noted mother attended one of father's dependency hearings involving his daughters. Given mother's loyalty toward father, Race was concerned about mother's ability to have any sort of insight into the situation so she could prevent another incident of abuse to D.S. or his siblings.

Mother's therapist, Sandra Sawyer, testified that she had minimal experience in providing counseling to a parent where sexual abuse was involved, and that she had never been qualified as an expert in a dependency matter. The juvenile court allowed her to offer her expert opinion regarding mother's potential for success in therapy but not regarding mother's ability to safely parent the children in the future. Sawyer had ten counseling sessions with mother. She testified that, initially, mother had "a strong degree of trust in the father of the children based on life experiences with him" and that because of this trust, mother was in a state of denial regarding the sexual abuse. Sawyer said that as time went on, mother began to work through the different stages of grief and

4

loss and was "willing to believe" D.S. was sexually abused. Sawyer later changed her testimony to say mother acknowledged D.S. had been sexually abused.

Mother's testimony was more equivocal. She testified she never heard or saw anything to suggest that father was sexually inappropriate with the children. She said her inability to speak with D.S. impacted her ability to believe his disclosure. She stated, "I wanted to hear this from him. I wanted to know what had happened, because coming from him, I would be able to know the truth, and not hearing it from him was very hard." Mother did watch the portion of the videotaped SART interview in which D.S. said father put his penis in D.S.'s mouth and in his butt, but said it was not convincing because he was being questioned by a detective and not by her. Mother said she was making progress in therapy and that she was "able to understand that through this and through my own conflicts, that it is possible that my son was molested." She admitted she was not certain he had been sexually abused, but thought it was possible. She acknowledged she still loves father, but said "I cannot have anything to do with him because I need to be a mother to my children. It took me sometime to realize that and I'm sorry about that mistake that I've made, but I know what I need to do now."

After hearing all of the evidence, Race did not change her recommendation to deny mother reunification services. She explained: "[M]other . . . in my opinion, still doesn't get it. Even in her testimony here today, it raises a lot of red flags for me. Honestly, it's very frustrating to hear her say the things she said and not have her wholeheartedly support and advocate for the children. The fact that she is hung up on when or where or how she hears it is very concerning and very frustrating."

The juvenile court determined that section 361.5, subdivisions (b)(6) and (b)(7) applied by clear and convincing evidence as to both parents, and found that family reunification services would not benefit any of the children. The court stated: "The evidence supports a finding and conclusion that the mother gave implied consent to the continued victimization of the minor [D.S.] by his father. She knew what [father] had done to [D.S.], because the child told her, and yet she continued to leave him alone with his abuser." It also "note[d] that the mother continued to have contact with the father in

5

person and by letter for a full two months after removal of the children, and only stopped visiting [him] in jail after it became a major issue at the jurisdictional hearing. It appears to this Court that based on the evidence; the mother's love for the abuser supersedes her duty and responsibility to protect her children."

The juvenile court set a hearing for July 17, 2014, to decide whether to terminate parental rights. Mother petitions this court for an extraordinary writ vacating the court's order and granting reunification services.[2]

DISCUSSION

*Standard of Review*

Section 361.5 allows the juvenile court to bypass reunification if the criteria set forth in any one of its numbered subsections are satisfied. Here, the juvenile court relied on the bypass provisions in subdivisions (b)(6) and (b)(7). To uphold the juvenile court's order, we need only find substantial evidence to support one of these grounds.[3] (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 382; *Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 881.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We do not reweigh the evidence or consider matters of credibility. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) The petitioner has the burden of proving that a finding is not supported by substantial evidence. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

---

[2] Father did not file a petition.

[3] Mother's petition challenges the juvenile court's decision to bypass reunification services under section 361.5, subdivision (b)(6), but does not address the court's decision to also bypass under subdivision (b)(7). Because we conclude substantial evidence supports the bypass of services under subdivision (b)(6), we need not address the alternative ground.

6

*Denial of Reunification Services*

Section 361.5, subdivision (b)(6) allows the juvenile court to bypass reunification services to a parent if it finds, by clear and convincing evidence, "[t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half-sibling by a parent or guardian, as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."  Because the abuse may be inflicted by either an "act" or "omission," a parent's failure to protect a child from such abuse falls within this exception.  (*Ibid.*; see *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 851; *Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561.)

Mother contends there is no competent evidence to support the juvenile court's findings that she gave her implied consent to father's sexual abuse of D.S. and that the three children would not benefit from reunification services.  The record is to the contrary.

The juvenile court found that mother impliedly consented to the continued victimization of D.S. because even after D.S. told her what father had done, she took no steps to prevent further abuse.  His maternal aunt spoke to D.S. after she saw him "humping" her three-year-old daughter.  D.S. told her that father puts his penis into his mouth and into his butt.  When asked if he had told his mother, D.S. responded "that he did and his mom yelled at his father and told him not to do it again."  D.S. similarly told social worker Lee that "[m]y dad put his 'peanut' into my mouth and put his 'peanut' in my butt."  He said father "comes into my room, he takes my clothes off.  He takes his clothes off.  It is dark and he hurts me.  He made me cry."  D.S. reported that "when mommy's not at work, he won't do it.  When she's at work, he will do it."

It is undisputed that the boys resided with both parents and that mother worked nights.  According to D.S., father watched him on the nights mother was working.  The situation did not change after D.S. told mother of the sexual abuse.  She made no effort to investigate the charge or to prevent D.S. from being alone with father.

7

Mother asserts she never saw any indication of father's propensity for sexual abuse, was confused by D.S.'s disclosure of the abuse and is now addressing her issues in therapy. These assertions are irrelevant, however, because the juvenile court did not find that mother should have known about the sexual abuse. It found she did know about it because D.S. had told her about it. Substantial evidence supports this finding. (*In re Geoffrey G., supra,* 98 Cal.App.3d at p. 420.)

Substantial evidence also supports the juvenile court's finding that providing reunification services to mother would not benefit the children. Father repeatedly abused six-year-old D.S. by inserting his penis into his son's mouth and anus. Mother refused to believe the abuse occurred even after watching her son describe it in detail on a videotape. She remained unconvinced when D.S. required therapy to address sexually reactive behaviors consistent with abuse, such as touching another student's rear end while using the urinal, trying to kiss a female cousin and "humping" a neighbor's child. Mother was not persuaded when D.S. and his half-sister, A.L., reported that father had sexually abused A.L. in a similar manner. Nor was mother convinced when father was criminally charged with D.S.'s abuse. Mother claimed that "[f]ather hasn't been a good part of [D.S.'s] life" and that "[D.S.] doesn't even like him at all," but did not see a connection between D.S.'s dislike of father and the abuse. Afraid to lose a "good guy," mother stood by father, handling his personal affairs, assisting with his criminal defense, providing moral support and continually assuring him of her love and devotion.

Mother contends the juvenile court failed to give sufficient weight to Sandra Sawyer's expert testimony regarding mother's progress in therapy and her maternal bond with the boys. Under the substantial evidence standard, we may not reweigh the evidence, resolve evidentiary conflicts or evaluate the credibility of witnesses. (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 947.) Mother has failed to demonstrate the juvenile court erred by finding it would not benefit the children to pursue

8

reunification services with her.

The petition for extraordinary writ is denied.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

9

Teresa Estrada-Mullaney, Judge

Superior Court County of Santa Barbara

_____

David M. Bixby for Petitioner.

No appearance for Respondent.

Michael C. Ghizzoni, County Counsel, Bo Bae, Deputy County Counsel, for Real Party in Interest.